Sandra ALFONSO, Plaintiff,

v.

**GTE DIRECTORIES CORPORATION,**
**Defendant.**

**No. 99CV1422-AA.**

United States District Court,
D. Oregon.

March 19, 2001.

Tom Steenson, Zan Tewksbury, Steenson, Schumann, Tewksbury & Rose, P.C., Portland, OR, for plaintiff.

John V. Acosta, Timothy J. O'Connell, Clarence M. Belnavis, Stoel Rives, LLP, Portland, OR, for defendant.

## OPINION AND ORDER

AIKEN, District Judge.

Sandra Alfonso ("Alfonso") filed suit against GTE Directories Corporation ("GTE"), alleging (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq.*, and Or.Rev.Stat. § 659.030; (2) unlawful retaliation; (3) wrongful discharge; (4) intentional infliction of emotional distress (IIED); and (5) violation of the Equal Pay Act. The defendant filed a motion for summary judgment, on which the court heard oral argument on March 5, 2001. Defendant's motion is granted in part and denied in part.

## BACKGROUND

On November 23, 1998, GTE hired Alfonso as a telephone sales associate in its Portland area office. Around October 1998, GTE created a sales unit comprising new account representatives and promoted Greg George ("George") to the position of District Sales Manager ("DSM") in charge. Alfonso joined the new unit.

GTE required all sales associates, including Alfonso, to meet at least 100 percent of their annual sales quotas, or "budgets." Associates could voluntarily set their annual budget goals higher than 100 percent; those who performed above budget received correspondingly greater compensation. George and Marcia Skiver, the Manager of Human Resources for GTE's Northwest Region, assert that Alfonso set her 1999 performance goal at 175 percent of budget. By contrast, Alfonso claims that George not only imposed upon Alfonso the 175 percent goal but later increased it to 200 percent.[1]

Nicole Perkins, formerly a DSM in GTE's Portland office, described the office's management team as an "all boys club." Exh. "F" to Tom Steenson's affidavit in opposition (deposition of Nicole Perkins at 24). Furthermore, Perkins testified that George and Merritt opined that "[w]omen are a lot more emotional and a lot more sensitive, so they're going to need a little bit more time," and that they "didn't want to deal with women crap." *Id.* at 42. Because Perkins perceived George and Ron Merritt (another DSM) as antagonistic toward female employees, she "felt sorry" for Alfonso and tried to "guide" her. *Id.* at 34. For example, Perkins testified in deposition that Merritt amused himself by making female employees cry. *Id.* at 71. Perkins also recalled that George referred to Alfonso as "a F"ing bitch," and said he "didn't want to put up with her crap." *Id.* at 42.

Alfonso alleges that George and Merritt "subjected Alfonso to a hostile work environment and treated her differently because of her sex." Plaintiff's Concise Statement of Material Facts at ¶ 16. Skiver's notes following a February 2, 1999 telephone conversation with Alfonso document a "communication problem" between Alfonso and George. Exhibit "V" to Tom Steenson's affidavit. During this conversation with Skiver, Alfonso reported that she believed Merritt was trying to "bully" her and that Merritt and George were "teaming up" against her because she was "a very strong woman." *Id.* In response,

1. In support, Alfonso offers a January 28, 1999 interoffice memorandum from Alfonso to George, in which she "recaps" a conversation in which George allegedly "told" her to meet the 200 percent goal. Exh. "S" to Tom Steenson's Affidavit in Opposition to GTE's motion for summary judgment.

Skiver arranged a meeting with Alfonso, George, and Mark Van Duren, GTE's District Manager. In her follow-up notes, Skiver reported that this meeting seems to have "helped" resolve some of Alfonso's "communication issues" with George. Nothing in the record documents any discussion of sex discrimination during this meeting.[2]

With respect to her discussions with Van Duren, Alfonso does not recall reporting any instances of gender-related unfair treatment. Defendant's Concise Statement of Material Facts at ¶ 21. Alfonso never complained of sexual harassment directly to George or Merritt. Furthermore, Merritt's behavior toward Alfonso did not change after she complained to Van Duren. Alfonso Deposition at 195:17–23. George alleges he became aware of Alfonso's complaints of sex discrimination only after Alfonso initiated this litigation.[3]

Alfonso's "hostile environment" claim is based on: (1) Merritt's behavior in "follow[ing] Alfonso around the office, interfer[ing] with her work, and [telling] her repeatedly to return to her desk;" telling Alfonso to "clean up her work area;" "screaming" at Alfonso in front of her coworkers; "shoving" a fax in Alfonso's face and "demanding" confirmation of a signature; and (2) George telling Alfonso to "stay at her desk at all times" and "not to interact with clerical staff or other sales representatives;" telling Alfonso to "get out" of his office; and calling Alfonso at home "to harass her." Plaintiff's Concise Statement of Material Facts at ¶ 16(a)-(c), (g)-(i).

On November 19, 1998, Alfonso documented a $489.90 advertising sale to "Ray Burt's Carpet Service." In her notes concerning customer verification of the sale, Alfonso indicated "TC/Ray B" (telephone conversation with Ray Burts). When Alfonso logged the account information into GTE's computer system, she again wrote "Tc/ray Burts" in the section documenting the method of customer verification. Defendant's Memorandum in Support at 14. GTE's computer records later revealed that Alfonso made an entry on December 9, 1998 stating that the Ray Burts account should be canceled because "Ray[ ][c]laims[ ][h]e never signed [a] fax author[ization]." Defendant's Concise Statement of Material Facts at ¶ 27.

During Alfonso's sick leave in early 1999, George maintained Alfonso's ac-

---

**2.** Alfonso left this meeting "with the impression that Van Duren was going to support his management team and not address her concerns about sex discrimination or the hostile work environment." Plaintiff's Concise Statement of Material Facts at ¶ 16(f). For his part, Van Duren testified in deposition that he: (1) could not recall any complaints by female employees concerning their treatment by male supervisors or coworkers, Van Duren Deposition at 33:16; (2) first listened to Alfonso's complaints about George in the context of her belief that George was an "incompetent" DSM, *id.* at 35:3–14; (3) recalled facilitating the meeting between himself, George, and Alfonso to resolve the "nonproductive working environment between [George] and [Alfonso]," *id.* at 38:8; (4) recalled a later discussion with Skiver "about Ms. Alfonso complaining about George," *id.*

at 44:1–4, but did not recall being told by Skiver that Alfonso had complained of "gender discrimination," *id.* at 44:12–14; (5) could not recall whether anyone, either from Human Resources or elsewhere, had told him that Alfonso "had complained about what she thought was gender discrimination," *id.* at 45:5–12; and (6) never investigated allegations by Alfonso that she was suffering gender discrimination. *Id.* at 45:13–18.

**3.** George testified in deposition that neither Human Resources nor Van Duren told him that Alfonso had made gender-based discrimination complaints against him. George Deposition at 171:14–172:17. In fact, George believed that the meeting with Van Duren and Alfonso was aimed at "open[ing] up the lines of communications." *Id.* at 181:07–13.

counts. In March 1999, when George informed Alfonso of a sale he had made on her behalf, Alfonso asked George to delay reporting the sale to offset an anticipated $500 loss in the next pay period. *Id.* at ¶ 28. George refused to defer reporting the sale. George Deposition at 134. Alfonso then called Human Resources to complain. *Id.* at 134–35. His interest piqued, George investigated Alfonso's sales records to identify the $500 loss. He discovered that: (1) no one named "Ray Burts" existed; (2) the name "Ray Burt's Carpet Service" was derived from the business owners' combined names; (3) a person named Carl Ray Benson handled advertising for the business, which was done exclusively through U.S. West; (4) "Ray Burt's Carpet Service" never placed an ad with GTE; (5) Mr. Benson received an advertising bill from GTE and called Alfonso to discuss the error; and (6) Alfonso told Mr. Benson that there was a "mistake" and that she would "clear[ ] it all up." Defendant's Memorandum in Support at 15.

George then reviewed other customer complaints in Alfonso's file lodged during the preceding six months. GTE's customer relations department and other managers assisted. The investigation revealed two additional suspicious accounts. Defendant's Memorandum in Support at 15. In one case, the owner of Columbia Marine called GTE to complain that his company had never placed an ad. According to the owner, the person with whom Alfonso purportedly had spoken to establish the account, "Richard Irvin," had never worked for the company. *Id.* at 16. Also, Alfonso had listed the business address incorrectly. GTE could not verify authorization of this account. In the other case, Alfonso had resubmitted an ad, using a new telephone contact number, one month after the customer had canceled its advertisement. *Id.*

GTE's written policy expressly provides for termination for falsifying sales. The company's Standards of Business Conduct states that, "[GTE employees] may not create any false or misleading documents or accounting, financial or electronic records for any purpose.... [Each employee] must apply the highest standards in accurately recording (or reconciling known discrepancies) as each transaction is handled." Moreover, the "failure to honor these principles or other GTE policies may result in disciplinary action, up to and including dismissal ...." Exh. 4 to Skiver's Affidavit at 4. Plaintiff testified in deposition as follows:

Q. Did you have an understanding at the time you worked with GTE what could happen if you falsified a sale.

A. Yes.

Q. What was your understanding?

A. That you would be terminated.

Q. And how did you acquire that understanding? ·

A. That would be my understanding of any job that I worked at, that if I were to-I mean that's stealing ....

Q. Including at GTE?

A. Yes.

Q. And you knew that at the time you worked there.

Q. Yes, I did.

Alfonso Deposition at 120:2–17. In her surreply, however, Alfonso offers excerpts from authorization disputes involving other account representatives at GTE for the purpose of proving that GTE *did not* enforce a policy of terminating employees who falsified sales. Plaintiff's Surreply in Support of Her Opposition to Defendant's Motion for Summary Judgment at 2–7.

George concluded at the end of his investigation that GTE should terminate Alfonso for fraud. He detailed the results of his investigation in a memorandum to

Skiver. On March 15, 1999, George sent another memorandum to Van Duren and Skiver, reiterating the reasons supporting, his decision to terminate Alfonso, in the form of a termination letter to Alfonso. *See* Exh. 17 to Skiver Affidavit. On March 17, 1999, Skiver informed Van Duren in an email message that the company did not routinely send termination letters. In this message, Skiver confirmed with Van Duren that Alfonso's termination resulted from "misconduct for not having proper authorization on at least 8 accounts." *See* Exh. 16 to Skiver Affidavit. George and Van Duren terminated Alfonso by telephone on March 19, 1999. George informed Alfonso she was being terminated for "fraud," but did not discuss any details concerning specific accounts. George Deposition at 210:13–20. During this conversation, Alfonso had no opportunity to examine the documentation upon which George based his findings of fraud.

### STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Substantive law on an issue determines the materiality of a fact. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party

shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

Special rules of construction apply when evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Electrical*, 809 F.2d at 630. In an employment discrimination case, "if a rational trier of fact could, on all the evidence, find that the employer's action was taken for impermissibly discriminatory reasons," summary judgment for the moving party is inappropriate. *Wallis v. J.R. Simplot*, 26 F.3d 885, 889 (9th Cir.1994).

### DISCUSSION

**I. Title VII Claims**

*A. Gender Discrimination*

██ In resolving Alfonso's gender discrimination claim under Title VII, the court employs a three-tiered analysis. Alfonso bears the initial burden of establishing a prima facie case of sex discrimination. *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir.1996). To establish a prima facie case, Alfonso must offer evidence that " 'give[s] rise to an inference of unlawful discrimination.' " *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). To meet this burden, Alfonso may rely on the factors established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to demonstrate she was (1) a member of a protected class; (2) qualified for the job or satisfactorily per-

formed the job; (3) subject to an adverse employment decision; and (4) treated differently than those similarly situated outside her protected class. *Id.* Alternatively, Alfonso may offer "more direct evidence of discriminatory intent." *Id.* In general, the " 'requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.' " *Id.* (quoting *Wallis,* 26 F.3d at 889).

■ If Alfonso establishes her prima facie case, the burden then shifts to GTE to rebut the presumption of discrimination by providing nondiscriminatory reasons for its allegedly discriminatory conduct. *Godwin,* 150 F.3d at 1220. Finally, if GTE offers a facially nondiscriminatory reason for terminating Alfonso, the burden shifts back to Alfonso to show that GTE's proffered reason was a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At that point, the presumption of unlawful discrimination "simply drops out of the picture," *St. Mary's,* 509 U.S. at 511, 113 S.Ct. 2742, and Alfonso "bears the ultimate burden of persuading the court that the stated reason for the discharge was false and the true reason for the discharge was unlawful sex discrimination." *Bradley,* 104 F.3d at 270 (citing *St. Mary's,* 509 U.S. at 507–08, 113 S.Ct. 2742). Although the presumption of discrimination "drops out of the picture" if GTE satisfies its burden of production, the "trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.' " *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089). In keeping with *Reeves,* the Ninth Circuit recently observed that "a disparate treat-

ment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting her prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons." *Chuang v. University of Cal. Davis, Bd. of Trustees,* 225 F.3d 1115, 1127 (9th Cir.2000).

■ Alfonso has made a prima facie showing of gender discrimination. Alfonso complained of sex discrimination to Skiver in Human Resources. Skiver spoke with Van Duren about Alfonso's complaints. Van Duren supervised George; he arranged a meeting with Alfonso and George to air Alfonso's grievances. On this record, the substance of George's discussions with Van Duren is unclear. Nevertheless, the timing of George's "investigation" into Alfonso's accounts, closely followed by Alfonso's termination, when placed against the backdrop of a purportedly male-charged working atmosphere, creates an inference of discriminatory intent. In finding that Alfonso has met her prima facie showing, I acknowledge that the Ninth Circuit imposes a very low evidentiary threshold. The facts here, while arguably minimal, do give rise to "an inference of unlawful discrimination." *Wallis,* 26 F.3d at 889.

Because Alfonso established her prima facie case, GTE must provide a legitimate nondiscriminatory reason for its decision to terminate Alfonso. As detailed above, GTE purportedly terminated Alfonso for falsifying sales, and has produced evidence corroborative of that decision. Thus, the burden shifts again to Alfonso to show that GTE's reason was a pretext for discrimination.

■ *Godwin* holds that the quality of pretext evidence determines the quantity required to survive summary judgment. In this respect, where "direct evidence of discriminatory motive" exists, "a triable

issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin*, 150 F.3d at 1221. The court then defined "direct evidence" as evidence " 'which, if believed, proves the fact [of discriminatory animus] without inference or presumption.' " *Id.* (quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir.1994)). As examples, the court cited Ninth Circuit cases involving statements made by employers (or their agents) containing sexual or racial stereotyping or pejoratives. *Id.* (citing *Cordova v. State Farm Ins.*, 124 F.3d 1145, 1150 (9th Cir.1997); *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir.1991); *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir.1991)). By contrast, where direct evidence is unavailable, the plaintiff-employee must produce "specific" and "substantial" circumstantial evidence "that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Id.* at 1222 (citing *Bradley*, 104 F.3d at 270).

The court in *Warren v. City of Carlsbad*, 58 F.3d 439 (9th Cir.1995), observed that

[A]ny indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder. Once a prima facie case is established ... summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the elusive factual question of intentional discrimination.

*Id.* at 443 (quoting *Lindahl*, 930 F.2d at 1438 (internal citation omitted)).

■ Albeit scant, Alfonso has produced evidence of discriminatory motive. In *Warren*, the court found racially derogatory comments by the employee's supervisor to be probative of discriminatory motive. *Id.* Likewise, in *Lindahl*, the court found that a supervisor's remarks indicating sexual stereotyping created an inference of discriminatory motive. *See also Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.1985) (suggesting that a discriminatory remark can create inference of discriminatory motive). Nicole Perkins recalled in deposition testimony that George referred to Alfonso as "a F'ing bitch," and said he "didn't want to put up with her crap." Exh. "F" to Tom Steenson's affidavit in opposition (deposition of Nicole Perkins at 42). Furthermore, Perkins testified that George and Merritt opined that "[w]omen are a lot more emotional and a lot more sensitive, so they're going to need a little bit more time," and that they "didn't want to deal with women crap." *Id.* at 42. Following the instruction of the Court in *Reeves*, this court may consider the evidence establishing Alfonso's prima facie case-namely, the timing of Alfonso's complaints to Human Resources vis a vis George's recommendation to terminate Alfonso-along with additional evidence of discrimination in determining whether GTE's proffered reason for terminating Alfonso was merely pretextual.

Because George's comments to Perkins provide direct evidence of discriminatory animus,[4] Alfonso need not provide addi-

---

4. I find these comments carry more weight than mere "stray remarks." *See Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (finding comments "stray" when "uttered in an ambivalent manner and ... not tied directly to [plaintiff's] termination"); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990) (defining "stray" remarks as arguably discriminatory yet "unrelated to

the decisional process"). The Ninth Circuit later distinguished *Merrick* and *Nesbit*, holding that the comments of "senior decisionmakers" need not be tied directly to an employee's adverse employment decision to be probative of discriminatory animus. *Mustafa v. Clark County School District*, 157 F.3d 1169, 1180 (9th Cir.1998). The "decision-

tional, "substantial" circumstantial evidence of discrimination. *See Reeves*, 120 S.Ct. at 2109. Nevertheless, in her surreply, Alfonso offers a list of authorization disputes involving other sales representatives at GTE. While this list fails to document these incidents in detail, it does offer examples of incidents similar to those for which GTE terminated Alfonso but which did not result in termination for the sales representatives involved. This circumstantial evidence sharpens the factual dispute concerning whether GTE followed established procedure in "investigating" Alfonso's records and terminating her without seeking an explanation for her apparent fraud.

■ Admittedly, to deem George's decision to "investigate" Alfonso's accounts and then terminate her for apparent falsifications an impermissible, retaliatory act, the court must infer that George knew Alfonso had complained of sex discrimination. Yet, given the cumulative effect of (1) Perkins' troubling characterizations of the Portland office, in general, and of George and Merritt's attitudes toward women, specifically; (2) the evidence corroborating Alfonso's complaints to Human Resources regarding sex discrimination; and (3) the close temporal proximity of Alfonso's complaints and George's "investigation," I find that Alfonso has produced meaningful evidence of pretext. Therefore, GTE's motion for summary judgment with respect to Alfonso's Title VII claim is denied.

## B. *Retaliation*

[9] To establish a prima facie case of retaliation, Alfonso must show that (1) she

was engaging in an activity protected under Title VII, (2) GTE subjected her to an adverse employment decision, and (3) a causal link existed between the protected activity and the employer's action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987). Likewise, Oregon law-makes it an unlawful employment practice for an employer to "discharge ... any person because the person has opposed any [discriminatory] practices." Or.Rev.Stat. § 659.030(1)(f).

■ The record does not clearly establish whether Human Resources, either directly or indirectly, told George that Alfonso had complained of sex discrimination. George denies knowing of such complaints, but facts in the record create an inference of impermissible retaliation. Accordingly, for the reasons stated in Part A above, GTE's motion for summary judgment with respect to Alfonso's retaliation claim (both on state and federal grounds) is denied. *See Snead v. Metropolitan Property & Casualty Ins. Co.*, No. 99–35071, 2000 WL 33122829, at *9 (9th Cir. Jan.23 2001) (declining to provide separate analyses for state (Oregon) and federal claims after finding an issue of fact precluding summary judgment on the federal claim).

## C. *Hostile Work Environment*

Descriptions of the incidents, as reported by Alfonso, that form the basis for Alfonso's hostile work environment appear above. GTE portrays these allegedly discriminatory acts as "infrequent conduct that may be rude or offensive, but not conduct that creates an actionable hostile work environment." Defendant's Memo-

---

maker" in *Mustafa* had made critical decisions "at every critical stage of the dispute" involving the plaintiff's employment. *Id.* Accordingly, the court found that, "Evidence of ethnically biased remarks from a person in such a position of authority are sufficient to

allege the connection necessary ... to survive summary judgment." *Id.* Here, George was the key "decision-maker" at every critical stage of GTE's investigation and termination of Alfonso.

**1222**

randum in Support at 24. Alfonso relies on *Harris v. Pameco Corporation,* 170 Or. App. 164, 180, 12 P.3d 524 (2000) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)), for the proposition that she may base a hostile work environment claim on nonsexual conduct that nevertheless "expose[d][her] to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed." The Court in *Harris* took a "middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Accordingly, the Court defined a "hostile" or "abusive" work environment as follows: "When the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id.* (citations and internal quotations omitted). Additionally, the Court held that, "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *Id.*

The Court recently clarified the standards that apply to Title VII claims for sexual harassment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Most helpful to this inquiry is the Court's admonition that the "standards for judging hostility [must be] sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Additionally, the Court observed that these standards "will filter out complaints attacking 'the ordinary tribulations of the

workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992) (footnotes omitted)).

Sexual or gender-based conduct violates Title VII where it "pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Com.,* 25 F.3d 1459, 1463 (9th Cir.1994) (interpreting *Harris,* 510 U.S. at 22, 114 S.Ct. 367). For a work environment to be "abusive," it must be hostile both from the perspective of the plaintiff and also from the perspective of a reasonable person with the same fundamental characteristics as plaintiff. *Id.* The finder of fact measures hostility from the totality of circumstances. *Id.* With respect to nonsexual conduct, Alfonso need not allege sexually explicit conduct, but rather, she need only establish that she was treated differently because of her gender. *See Smith v. Hoffman Structures, Inc.,* No. Civ. 99–77–AS, 1999 WL 1490818, at *9 (D.Or. Dec.14, 1999).

This record contains no evidence of conduct that polluted Alfonso's work environment with hostility or abusiveness as conceived by either *Harris* or *Faragher,* or by the Ninth Circuit. Moreover, Alfonso fails to connect the allegedly "hostile" actions of George and Merritt (and any other GTE employees) with sex-based discriminatory motives of any sort. The acts forming the substance of Alfonso's hostile work environment claim amount to nothing more than impolite behavior, which falls short of the *Harris* court's conception of Title VII's purview. Therefore, GTE's motion for summary judgment on Alfonso's hostile work environment claim is granted.

## II. Wrongful Discharge

Oregon courts allow recovery for the common-law tort of wrongful discharge in limited circumstances. In fact, only two situations support claims for wrongful discharge, an exception to the at-will employment doctrine: (1) "when an employee is discharged for fulfilling an important societal obligation;" and (2) "when an employee is discharged for exercising an employment related·right of important public interest." *Carlson v. Crater Lake Lumber Co.*, 103 Or.App. 190, 193, 796 P.2d 1216, 1219 (1990). Moreover, an employer's wrongful purpose "must have been 'a factor that made a difference' in the discharge decision." *Estes v. Lewis and Clark College*, 152 Or.App. 372, 381, 954 P.2d 792, 797 (1998).

Because this court denies summary judgment in favor of GTE on Alfonso's gender discrimination and retaliation claims, it must also deny GTE's motion on the wrongful discharge claim. In essence, the same unresolved factual issue-namely, whether George investigated and terminated Alfonso in retaliation for the sex discrimination complaints she lodged with Human Resources-precludes summary judgment on this state law claim. If, in fact, Alfonso's complaints of sex discrimination "made a difference" in George's decision to fire Alfonso, her discharge was "wrongful" under Oregon law.

## III. IIED Claim

Under Oregon law, a plaintiff alleging intentional infliction of emotional distress must plead: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 543, 901 P.2d 841 (1995) (quoting

*Sheets v. Knight*, 308 Or. 220, 236, 779 P.2d 1000 (1989)) (internal quotations omitted). Alfonso's IIED claim fails. The record lacks any evidence that George, Merritt, or any other GTE employee, acted with *intent* to cause Alfonso severe emotional distress. *See McGanty*, 321 Or. at 551, 901 P.2d 841 (intent "extends not only to those results which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does. The actor who fires a bullet into a dense crowd may fervently pray that the bullet will hit no one, but if the actor knows that it is unavoidable that the bullet will hit someone, the actor intends that consequence"). Moreover, none of the actions forming the basis of Alfonso's IIED claim amounts to conduct transgressing the "bounds of socially tolerable conduct." Firing an employee does not exceed the bounds of socially acceptable behavior. *Patton v. J.C. Penney Co.*, 301 Or. 117, 123, 719 P.2d 854 (1986). Even where termination is wrongfully motivated, the employer's action will not give rise to a claim for IIED. *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 204, 818 P.2d 930 (1991) ("The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior."). GTE's motion for summary judgment on Alfonso's intentional infliction of emotional distress claim is granted.

## IV. Equal Pay Act Claim

Alfonso withdrew her Equal Pay Act claim before GTE filed its summary judgment motion. *See* Affidavit of Tom Steenson. Accordingly, GTE's motion against this claim is now moot.

## CONCLUSION

Defendant's motion for summary judgment (document 29) is granted in part and denied in part as follows: defendant's mo-

tion is granted as to plaintiff's claims for hostile work environment and IIED; defendant's motion is denied as to plaintiff's claims for gender discrimination, retaliation, and wrongful discharge. Plaintiff's Equal Pay Act claim is withdrawn.

IT IS SO ORDERED.